FILED
02/11/2022
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 5, 2022 Session

**STATE OF TENNESSEE v. BRUCE ANTIONE COLE**

**Appeal from the Circuit Court for Madison County**
**No. 19-922    Donald H. Allen, Judge**

_____

**No. W2021-00175-CCA-R3-CD**

_____

A Madison County jury convicted the defendant, Bruce Antione Cole, of aggravated assault and being a convicted felon in possession of a firearm. Following a sentencing hearing, the trial court imposed an effective sentence of forty-five years in confinement and ordered the defendant pay $25,474.16 in restitution. On appeal, the defendant challenges the trial court's imposition of consecutive sentencing and its restitution order. After reviewing the record and considering the applicable law, we affirm the defendant's convictions and sentence but remand for a hearing on the matter of restitution.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Reversed in Part, and Remanded**

J. ROSS DYER, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and JILL BARTEE AYERS, JJ., joined.

Jessica F. Butler, Assistant Public Defender, Franklin, Tennessee (on appeal) and Gregory Gookin, Assistant Public Defender, Jackson, Tennessee (at trial), for the appellant, Bruce Antione Cole.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matthew Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On March 26, 2019, the defendant shot the victim, Kevin Transou, four times in the parking lot of Foam Fabricators, Inc., where the two men worked in Jackson, Tennessee.

For his actions, a Madison County grand jury indicted the defendant for attempted first-degree murder (count 1), aggravated assault (count 2), employing a deadly weapon during the commission of a dangerous felony (count 3), employing a deadly weapon during the commission of a dangerous felony when the defendant had a prior felony conviction (count 4), and being a convicted felon in possession of a firearm (count 5). Tenn. Code Ann. §§ 39-12-101, -13-102, -13-202, -17-1307(b)(1)(A), -17-1324(b), -17-1324(h)(2). The defendant proceeded to trial on October 15, 2020, where the following evidence emerged.

The shooting occurred around 4:45 p.m. after the defendant and the victim ended their shifts as machine operators. The victim explained that prior to the shooting, he and the defendant argued after a machine they were working on malfunctioned. The defendant told the victim to turn the machine off but the victim refused, fearing he would be injured. As a result, the defendant turned the machine off and started calling the victim a "weak a** boy" and "b**** a** n*****." The victim became angry and told the defendant to "quit disrespecting" him. When the defendant continued to taunt the victim, the victim went outside for a smoke break.

After the break, the victim resumed working on the machine with the defendant. However, approximately fifteen or twenty minutes later, the machine malfunctioned again, and the defendant and the victim's argument resumed. The victim told the defendant that "if he disrespected me like that again, it [was] going to be a problem." Despite the victim's warning, the defendant was "all up in" the victim's face "talking crazy." The victim soon felt "a bump," turned around, and saw the defendant. The two continued to argue, and the victim slapped the defendant in the face. The defendant stated his eye was injured, and the two again "had words." The defendant then took a break and when he returned about twenty minutes later, the victim saw that the defendant "had a pistol in his pocket." The victim informed his co-workers and a supervisor of the pistol before going outside for another smoke break.

After the break, the victim went inside to gather his things before the end of his shift. The victim walked past the defendant who "looked at [him] crazy" and stated, "ain't (sic) no sense looking at me crazy because I'll slap you again if you want to keep playing." The two separated, and when the victim later exited the building, the defendant "was out there waiting on [him]." Outside, the defendant looked at the victim, and the victim stated, "I know you got your gun . . . but you need to go on and use it." According to the victim, "about that time," the defendant started shooting.

When the shooting began, the victim "struck out running" but was chased by the defendant who continued shooting. The victim described the gun as a .38-caliber revolver and estimated the defendant was approximately ten feet from him when the defendant fired the first shot. The defendant initially shot the victim twice in the left leg, causing him to

fall, started calling the victim names, and claimed he should kill the victim. When the victim tried to get up, the defendant shot him in the right leg. A struggle over the gun then ensued until the defendant "pistol whipped" the victim and fired a final shot to the victim's stomach. The defendant again stated that he should have killed the victim before fleeing the scene. The victim identified the area of the shooting and the path he ran during the shooting in several photographs that were entered into evidence and presented to the jury.

Gary Shackelford witnessed the shooting while working in the UPS truckyard that faced the parking lot of Foam Fabricators, Inc. Mr. Shackelford saw the victim "running for his life" as the defendant fired numerous shots. Mr. Shackelford ran inside the UPS warehouse and informed his supervisor of the shooting. The supervisor, a former EMT, ran outside to assist the victim until police and paramedics arrived. The victim was ultimately airlifted to Regional One Health in Memphis where he remained for nine days. As a result of his injuries, the victim testified he has been unable to return to work and is awaiting another surgery.

Daryl Tyler worked in maintenance for Foam Fabricators, Inc. and knew both the defendant and victim in passing. On the day of the shooting, Mr. Tyler left work in his 2007 Toyota Tundra around 5:00 p.m. when he saw the defendant "running down the road." The defendant flagged Mr. Tyler down and asked Mr. Tyler to give him a ride to nearby apartments. Mr. Tyler agreed, and the defendant entered Mr. Tyler's vehicle. At the time, Mr. Tyler was unaware of the shooting.

While en route, Mr. Tyler stopped at a Shell gas station. The defendant went inside while Mr. Tyler got gas. When the defendant returned to Mr. Tyler's vehicle, he asked Mr. Tyler to take him somewhere other than the nearby apartments because there were several police vehicles at the apartments. While the two drove "towards town," Mr. Tyler received a phone call from Bob Shaw, a plant manager for Foam Fabricators, Inc. Mr. Shaw asked Mr. Tyler if someone named "Bruce Cole" was in his vehicle. Mr. Tyler asked the defendant if his name was "Bruce Cole," and the defendant denied the same. Mr. Tyler relayed the information to Mr. Shaw, who stated he would call Mr. Tyler back. When Mr. Shaw called back, he told Mr. Tyler that the man in his vehicle was "Bruce Cole" and that "he just shot somebody at the plant." Mr. Tyler told Mr. Shaw his location before the defendant took Mr. Tyler's phone. Mr. Tyler continued driving, and police soon initiated a traffic stop. As Mr. Tyler began to slow down, the defendant jumped out of the vehicle and "took off running."

Several officers from the Jackson Police Department responded to the scene of the shooting, participated in locating the defendant after the shooting, and contributed to the subsequent investigation into the shooting. Officer Steven Taylor was the first to respond to Foam Fabricators, Inc. where he located the victim and "immediately started to render

aid and [tried] to control [the victim's] bleeding." After paramedics arrived, Officer Taylor helped secure the scene, search for evidence, and prepare a report. Video footage from Officer Taylor's body camera was entered into evidence and presented to the jury.

Officer Ramanda Chestnut participated in the apprehension of the defendant.[1] After receiving a description of Mr. Tyler's vehicle over the radio, Officer Chestnut observed the vehicle and provided its location. Captain Kemper responded and initiated a traffic stop of the vehicle. The defendant, however, "exited the vehicle, and began to run north." Officer Chestnut pursued the defendant on foot, identifying herself as law enforcement and ordering the defendant to stop. The defendant, however, continued running and entered a wood line that "dumps out . . . onto the interstate area." Officer Chestnut then ended her pursuit.

Investigators Kelly Schrotberger and Rodney Savage continued pursuing the defendant on foot. At one point, Investigator Schrotberger identified himself and told the defendant to "lay down on the ground." Instead, the defendant ran, crossing Interstate 40. The investigators crossed the interstate and followed the defendant to a Toyota dealership. At the dealership, they located the defendant underneath a vehicle and arrested him. Investigator Schrotberger did not locate a firearm on the defendant. He identified a photograph of the defendant taken after his arrest which showed the defendant wearing a "white or light gray" jacket with a camouflage pattern on the sleeves.

The investigation progressed when Sergeant Adam Pinion learned Mr. Tyler and the defendant stopped at a Shell gas station shortly after leaving Foam Fabricators, Inc. Sergeant Pinion went to the gas station and viewed the pertinent security footage which was entered into evidence and presented to the jury. In the footage, Sergeant Pinion identified Mr. Tyler's vehicle at a gas pump, the defendant exiting the vehicle and entering the store, the defendant exiting the store and approaching a trashcan, the defendant reentering the passenger side of Mr. Tyler's vehicle, and Mr. Tyler driving away.

After viewing the security footage, Sergeant Pinion and Sergeant Nicholas Donald examined the trashcan the defendant had approached in the video and located a .38-caliber revolver. Sergeant Donald recorded Sergeant Pinion as he searched the trashcan and retrieved the revolver. This video footage was also entered into evidence and presented to the jury.

After locating the revolver, Sergeant Pinion examined it and determined that it was loaded. Photographs of Sergeant Pinion holding the revolver after having removed its

---

[1] At the time of trial, Officer Chestnut was no longer employed with the Jackson Police Department but instead with the Tennessee Bureau of Investigation, Drug Investigation Division.

cylinder were also entered into evidence. Sergeant Pinion examined the cylinder, noting four casings had indentions, indicating four shots had been fired from the revolver. Sergeant Pinion seized the revolver, cylinder, and bullets, submitted them into evidence with the Jackson Police Department, and presented the evidence to the jury. Specifically, Sergeant Pinion identified two live .38-special ammunition rounds, four spent .38-special ammunition rounds, and a .38-caliber revolver, cylinder, and the pin that holds the cylinder in the firearm. As part of the investigation, Sergeant Pinion requested DNA testing on the revolver and obtained DNA buccal swabs from the defendant.

Investigator Kevin Mooney photographed the scene of the shooting. The photographs showed numerous evidence markers placed near blood stains that illustrated the path the victim took during the shooting. Investigator Mooney also took two photographs of the revolver after it was seized and placed into evidence. One photograph showed the cylinder "loaded with the rounds." Based upon the markings, Investigator Mooney explained that four of the rounds had been fired and two were unfired. The photographs were entered into evidence and presented to the jury.

Aimee Oxley, the director of the evidence unit for the Jackson Police Department, and Deborah Cagle, an evidence technician, testified and established the chain of custody between the Jackson Police Department and the Tennessee Bureau of Investigation ("TBI") regarding the evidence seized during the investigation, including the revolver, the ammunition, and the buccal swabs.

TBI Special Agent Mark Dunlap testified as an expert in DNA analysis. He performed DNA testing on the revolver and detailed his findings in a forensic biology report which was entered into evidence. Special Agent Dunlap swabbed four areas of the revolver, including the grip, the trigger, the hammer, and the top strap. After identifying DNA on the revolver, Special Agent Dunlap compared the DNA from the revolver to the standard obtained from the defendant's buccal swabs and determined the major contributor of the DNA found on the revolver matched the defendant.

Before resting its case, the State read a stipulation into evidence regarding count 5 of the indictment. The stipulation read, as follows: "That the [d]efendant, Bruce Antione Cole, has a prior conviction for [a]ggravated [a]ssault (conviction date: January 27, 1999), which is a 'felony crime of violence as defined by T.C.A. § 39-17-1301(3) and involves the use of force or a deadly weapon, in violation of T.C.A. § 39-17-1307(h)(1)(A).'" The defendant then waived his right to testify and did not present any additional proof.

After deliberations, the jury found the defendant guilty of aggravated assault (count 2) and being a convicted felon in possession of a firearm (count 5) and acquitted the defendant of attempted first-degree murder (count 1), employing a firearm during the

commission of a dangerous felony (count 3), and employing a firearm during the commission of a dangerous felony after having been previously convicted of a dangerous felony (count 4).[2]

At the subsequent sentencing hearing, the State entered into evidence the presentence report along with certified copies of the defendant's prior convictions. The defendant offered testimony from his sister, Brittie Weddle, who stated the defendant was employed and "doing very well" prior to his arrest in this case. The trial court then imposed a fifteen-year sentence in count 2 to be served consecutively to a 30-year sentence in count 5. The trial court ordered the effective forty-five-year sentence to be served consecutively to a 12-year sentence in Madison County Circuit Court Case No. 13-577 for which the defendant was on parole at the time he committed the offenses in this matter. In addition, in count 2, the trial court ordered the defendant to pay restitution to the victim in the amount of $25,474.16 "at a rate of $150 a month."

The defendant filed a motion for a new trial, challenging, amongst other issues, the trial court's imposition of consecutive sentencing and restitution. The trial court denied the motion, and this timely appeal followed.

### *Analysis*

On appeal, the defendant argues the trial court erred in imposing consecutive sentencing and ordering $25,474.16 in restitution. The State contends the trial court properly sentenced the defendant but concedes the court failed to conduct a proper restitution hearing. We will address each issue in turn.

### I.   *Consecutive Sentencing*

The defendant contends the trial court erred in imposing consecutive terms. More specifically, the defendant argues the trial court erred in finding him to be a dangerous offender, asserting "the trial court based its decision largely on a collection of offenses [he] committed over 20 years prior" and noting the trial court "made no finding about the proportionality of the sentence in relation to the severity of the offenses." In contrast, the State contends the trial court "carefully considered the defendant's entire criminal history in the context of the commission of offenses and violations of probation, bond[,] and parole" before "properly determin[ing] that the defendant has an extensive history of

---

[2] We note, the trial court mistakenly referenced count 4 rather than count 5 when addressing the jury verdict regarding the defendant's conviction for being a convicted felon in possession of a handgun. However, the judgment forms correctly reflect the proper convictions based upon the indictment.

criminal activity, consisting of both felony and misdemeanor offenses." We agree with the State and affirm the judgments of the trial court.[3]

This Court reviews consecutive sentences imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W. 3d 682, 707 (Tenn. 2012); *State v. Pollard*, 432 S.W.3d 851, 859-60 (Tenn. 2013). The party appealing a sentence bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

Tennessee Code Annotated section 40-35-115 "creates several limited classifications for the imposition of consecutive sentences." *State v. Moore*, 942 S.W.2d 570, 571 (Tenn. Crim. App. 1996). A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Pursuant to statute, consecutive sentencing is warranted when "[t]he defendant is an offender whose record of criminal activity is extensive," "[t]he defendant is sentenced for an offense committed while on probation," or "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(2), (4), (6). In considering a defendant's dangerous offender status, a trial court can rely on the defendant's prior criminal history. *See State v. Crawford*, No. E2012-00001-CCA-R3-CD, 2013 WL 4459009, at *32 (Tenn. Crim. App. Aug. 19, 2013) (relying on three "prior violent felony convictions" and reciting "the facts leading to those convictions" in finding the defendant to be a dangerous offender). In imposing consecutive sentences based upon a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995); *see also State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999) (stating that the *Wilkerson* findings that the sentences are necessary to protect the public and reasonably relate to the severity of the offenses apply only to consecutive sentences involving dangerous offenders).

---

[3] We note, the defendant does not challenge the length of his sentences. As such, our review is limited to the imposition of consecutive terms.

Here, before imposing consecutive terms, the trial court determined the defendant was a career offender. The trial court stated:

> [The defendant] has one prior Class B felony conviction. He has, I believe, a total of nine prior Class C felony convictions and then he also has one Class E felony conviction. So, he has a total of 11 prior felony convictions, at least six of which will be used to place him as a career offender.

Upon reviewing the applicable enhancement factors, the trial court also found that the defendant had "29 prior misdemeanor convictions" and that on "at least 16 different occasions, he has committed new offenses while on probation or while on parole." Tenn. Code Ann. § 40-35-114(1), (8). Furthermore, the trial court found the defendant "was actually on parole in Madison County Circuit Court Docket Number 13-577" when he committed the present offenses.

After making these determinations, the trial court reviewed the State's request for consecutive terms and made the following findings:

> Now, I know the State did request the court to consider running these sentences consecutive to each other, and I am -- I have looked at this and under the consecutive sentencing statute, I do find number one: that the defendant is an offender whose record of criminal activity is extensive. I mean, again, there's no question about that considering what he's convicted of in this case, along with the prior -- 11 prior felony convictions and numerous misdemeanor convictions and certainly, his record of criminal activity is extensive. So, I do find that.
>
> I also find that the felonies for which he's being sentenced today did occur while he was on parole. So, I find that to be present.
>
> Now, the Court also finds that the defendant is a dangerous offender whose behavior indicates little or no regard for human life, and I also find that no hesitation -- that he has no hesitation about committing a crime in which the risk to human life is high.
>
> I mean, this is a situation where he got into an argument with [the victim] at work. Apparently, he went and got a gun, then he came after [the victim].

[The victim], who was trying to run away from him, is shot multiple times, at least four times by this defendant, who is not even supposed to be in possession of a firearm. I mean, he had been convicted 11 different times in the past, nine of which involved aggravated assault.

So, again, he certainly had no hesitation about committing a crime with which the risk to human life is high.

The Court also finds that the circumstances surrounding the commission of this offense are aggravated, that is, you know, fortunately, I think there was proof that the gun jammed or something and, -- and he obviously wasn't able to shoot more than just the four times, but, you know, very easily, [the victim] could have been shot and killed out there had he not received immediate medical care.

Also, the Court finds that confinement [for] an extended period of time is necessary to protect society from this defendant's unwillingness to lead a productive life, and the defendant's resort to criminal activity in furtherance of his anti-societal lifestyle.

You know, again, I have to look at [his] whole history. I mean, back in, you know, back in 1999, he was convicted of assaulting nine different individuals, convicted of aggravated assault against nine different individuals and then, in 2019, he's still out here committing a violent offense against another individual, [the victim].

So, the Court finds that the aggregate length of the sentences that - that I am imposing reasonably relate to the offenses for which the defendant stands convicted. So, I am going to order that the 15-year sentence for the aggravated assault will be served consecutive to the 30-year sentence for being a convicted felon in possession of a firearm after having these nine different prior violent felony convictions for aggravated assault.

So, he'll have a total effective sentence of 45 years to serve at 60 percent, which I believe is justified given the facts and circumstances as I talked about.

Our review of the record reveals the proof presented supports the trial court's findings and the decision to impose consecutive terms. As noted above, the record makes clear that the defendant is an offender whose record of criminal activity is extensive, the defendant committed the present crimes while he was on parole, and the defendant is a

dangerous offender, and each of these factors alone is sufficient to support the trial court's imposition of consecutive terms. Tenn. Code Ann. § 40-35-115(b)(2), (4), (6).

The record indicates the defendant's criminal history is extensive and began when he was eighteen-years old. Since that time, the defendant has accumulated eleven felony convictions, nine of which involved aggravated assault committed against nine individuals, twenty-nine misdemeanor convictions, and numerous terms of incarceration and probation. The State entered copies of the defendant's prior felony convictions into evidence, and the presentence report documented the entirety of the defendant's criminal history. Based on this proof, the trial court did not abuse its discretion in finding the defendant has an extensive criminal history or in imposing consecutive terms based upon that finding. Tenn. Code Ann. § 40-35-115(b)(2).

The trial court also found the defendant committed new offenses on "at least 16 different occasions" while on either probation or parole and determined the defendant was on parole for Madison County Circuit Court Docket Number 13-577 when he committed the present offenses. This finding is clearly supported by the record, and as such, the trial court did not abuse its discretion in imposing consecutive terms based upon that finding. Tenn. Code Ann. § 40-35-115(b)(6).

Finally, the record also supports the trial court's determination that the defendant is a dangerous offender. The trial court found the defendant shot the victim multiple times after an argument at work. After arguing, the defendant retrieved a gun and waited for the victim outside where the defendant fired numerous shots at the victim as the victim ran. The shooting occurred in close proximity to numerous businesses where many people were working. Relying upon the entirety of the defendant's criminal history, which included nine prior aggravated assault convictions, the trial court determined the consecutive terms reasonably related to the severity of the offenses committed by the defendant and were necessary in order to protect the public from further serious criminal conduct by the defendant. *Wilkerson*, 905 S.W.2d at 938; *see also Lane*, 3 S.W.3d at 461; *Crawford*, 2013 WL 4459009, at *32. Thus, the trial court did not abuse its discretion in imposing consecutive terms based upon finding the defendant to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). The dangerous offender factor is clearly established in the record, and consecutive sentencing is warranted as a result. Tenn. Code Ann. § 40-35-115(b)(4).

As outlined above, the record supports the trial court's classification of the defendant as a dangerous offender, a defendant with an extensive criminal history, and a defendant who committed the present offenses while on parole. Because the extensive criminal activity, parole, and dangerous offender statutory factors have been met,

consecutive sentencing was warranted. Tenn. Code Ann. § 40-35-115 (b)(2), (4), (6); *Crawford*, 2013 WL 4459009, at \*32 ("The presence of a single factor is enough to justify the imposition of consecutive sentencing."). The defendant is not entitled to relief.

## II. Restitution

The defendant argues the trial court erred in ordering the payment of $25,474.16 in restitution "because there are no findings in the record to support this amount, and the trial court failed to consider [the defendant's] ability to pay or set a timeframe in which payment had to be completed." The State concedes "that the trial court abused its discretion in its restitution award by failing to consider the defendant's resources and ability to pay." Upon our review, we agree that the trial court erred by failing to consider the requirements imposed by statute before entering an order of restitution. As a result, we remand the case to the trial court for a new restitution hearing.

This Court reviews challenges to the amount of restitution ordered by the trial court under an abuse of discretion standard, affording a presumption of reasonableness to the trial court's ruling. *State v. David Allan Bohanon*, No. M2012-02366-CCA-R3-CD, 2013 WL 5777254, at \*5 (Tenn. Crim. App. Oct. 25, 2013). "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case." *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999). "[T]he burden of showing that the sentence is improper is upon the appealing party." Tenn. Code Ann. § 40-35-401 (2014), Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

"While there is no set formula for determining restitution, above all, the restitution amount must be reasonable." *State v. John N. Moffitt*, No. W2014-02388-CCA-R3-CD, 2016 WL 369379, at \*4 (Tenn. Crim. App. Jan. 29, 2016), *perm. app. denied* (June 24, 2016) (citation omitted). "Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss." Tenn. Code Ann. § 40-35-304(b) (2014). In this context, "pecuniary loss" includes:

> (1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

> (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(e)(1), (2) (2014). "In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform." Tenn. Code Ann. § 40-35-304(d) (2014). Therefore, "the amount of restitution a defendant is ordered to pay must be based upon the victim's pecuniary loss and the financial condition and obligations of the defendant; and the amount ordered to be paid does not have to equal or mirror the victim's precise pecuniary loss." *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). "This is because '[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim.'" *John N. Moffitt*, 2016 WL 369379, at *4 (quoting *State v. Johnson*, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997)). "The court shall specify at the time of the sentencing hearing the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." Tenn. Code Ann. § 40-35-304(c) (2014). "The court may not, however, establish a payment or schedule extending beyond the expiration of the sentence." *John N. Moffitt*, 2016 WL 369379, at *5; Tenn. Code Ann. § 40-35-304(g)(2).

Here, the record indicates the trial court failed to properly consider the restitution factors required by statute before ordering the defendant to pay $25,474.16 in restitution to the victim. Instead, in support of its restitution order, the trial court merely stated:

> Now, the jury did impose fines in this case, but I'm not going to impose any fines. I just -- I don't see that the -- that he has the ability to necessarily pay fines. I am going to order the restitution because, again, I think the victim is entitled to be paid for his medical expenses that he's incurred, out-of-pocket expenses. I'm sure whatever insurance may have paid more than that, but I am going to order the defendant to pay restitution to the victim . . . in the amount of $25,474.16, and I'll order him to pay that at a rate of $150.00 a month, which I think is probably about as -- the most he could pay each and every month. But no fines will be imposed.

Based upon the above reasoning, nothing in the record indicates the ordered restitution was reasonable because the trial court failed to consider the defendant's financial resources or future ability to pay. The record indicates the presentence report noted that the victim requested restitution in the amount of $25,474.16 for his medical expenses, and the State provided copies of the victim's medical expenses to the court. However, during the sentencing hearing, the defendant disputed the expenses, arguing some of the invoices were duplicates. Thus, the alleged pecuniary loss suffered by the victim is not substantiated by evidence in the record nor was it agreed to by the defendant. Tenn. Code Ann. § 40-35-304(e)(1) (2014).

Furthermore, though the trial court ordered the defendant to pay the restitution "at a rate of $150.00 a month," nothing in the record indicates this performance schedule was reasonable. As shown above, the record is silent regarding the defendant's financial resources or his future ability to pay $25,474.16 to the victim. *See* Tenn. Code Ann. § 40-35-304(d) (2014). Rather, the record reflects that, at the time of sentencing, the defendant was forty-two years old, deemed indigent by the trial court, and facing an effective fifty-seven-year sentence in confinement. And, prior to ordering restitution in the amount of $25,474.16, the trial court determined the defendant did not have the ability to pay the fines imposed by the jury in the amounts of $10,000 and $2,500 in counts 2 and 5, respectively. Thus, the record indicates the trial court's logic and reasoning was improper as it relates to the $25,474.16 restitution order when viewed in light of the court's finding that the defendant did not have the financial resources or future ability to pay $12,500 in fines. *See Moore*, 6 S.W.3d at 242. The record indicates the trial court failed to properly consider the victim's pecuniary loss and the defendant's financial condition when ordering the defendant pay $25,474.16 in restitution to the victim. Because the trial court failed to conduct a full and proper restitution hearing, the record before us does not support the trial court's restitution order. As a result, we remand the case to the trial court for a new restitution hearing.

## *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

_____
J. ROSS DYER, JUDGE